UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
:
BETZAIDA MOLINA, :
:
Plaintiff, :
: 04 Civ. 3201 (GEL)
-v- :
: **OPINION AND ORDER**
JO ANNE B. BARNHART, :
Commissioner of Social Security, :
:
Defendant. :
:
------------------------------------x

Christopher J. Bowes, Center for Disability
Advocacy Rights, Inc., New York, NY, for Plaintiff.

Susan C. Branagan, Special Assistant United States
Attorney (David N. Kelley, United States Attorney
for the Southern District of New York, of counsel),
for the United States of America.

GERARD E. LYNCH, District Judge:

  Pursuant to 42 U.S.C. § 405(g), plaintiff Betzaida Molina brought this action to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits on the ground that she was not disabled. The Commissioner maintains that the decision should be affirmed, and moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Molina cross-moves for judgment on the pleadings, arguing that the Commissioner's decision is contrary to law, and is not supported by substantial evidence. For the reasons that follow, the Commissioner's motion is denied, and Molina's motion is granted, insofar as this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

## BACKGROUND

I.   Procedural History

On March 19, 2002, Molina filed an application for supplemental social security income benefits based on disability. (Tr. 52-55.) After the application was denied, Molina requested a hearing before an administrative law judge ("ALJ"). (Tr. 44-49.) The hearing was held on September 2, 2003, before ALJ Kenneth G. Levin. (Tr. 26-42.) On September 26, 2003, the ALJ issued a decision finding that Molina was not disabled, as defined by 20 C.F.R. § 416.920(f), at any time through the date of the decision. (Tr. 19.) On March 4, 2004, the Appeals Council denied Molina's request for review, and the ALJ's finding became the final decision of the Commissioner. (Tr. 3-5.) Molina appeals from that decision.

II.  Plaintiff's Personal History

Molina was born in Puerto Rico on November 23, 1981. In 1997, at age 16, she moved to Pennsylvania. In 2000, she graduated from high school, where she had taken both Spanish and English classes. According to Molina, she understands English "very well," but makes mistakes when speaking and writing. (Tr. 31.) She has filled out medical questionnaires in both English and Spanish.

Molina has thoracolumbar scoliosis.[1] (Tr. 110.) In 1996, she had surgery to implant Harrington rods in her back and correct the curvature of her spine. (Id.) Molina experiences pain in her lower back and right shoulder area, which she describes as "stabbing," "aching," and

---

[1] Scoliosis is a lateral deviation of the normal vertical line of the spine that is greater than ten degrees. It consists of a lateral curvature of the spine with rotation of the vertebrae within the curve. See National Scoliosis Foundation, Glossary of Terms, http://www.scoliosis.org/glossary.php

"intense." (Tr. 82, 110, 61.) She has stated that her pain gets worse when it is cold (Tr. 83), and that her pain prevents her from sleeping. (Tr. 75.) While Molina has given varying descriptions of her pain, the record as a whole indicates that she began experiencing pain sometime after the surgery, and that her pain worsened subsequent to giving birth to her son by a caesarean section in December 2000. (Tr. 128, 137.)

Molina states that her back pain prevents her from being able to mop, sweep, walk long distances, bend, lift, carry, push, or pull. (Tr. 75.) She experiences pain after walking or standing for more than ten or twenty minutes, and sitting for more than fifteen minutes. (Tr. 34, 83.) According to Molina, she is capable only of "light household chores," and her husband "does the tasks that require more physical effort," including mopping and bathing their son. (Tr. 75.) Her mother-in-law helps out around the house, and a neighbor helps Molina when she has appointments. (Tr. 34.) She attends a 30-minute church service two or three times a week. (Tr. 38.) She goes to the store and to the park with her family. (Id.) She is unable to dance or go to the movies. (Tr. 79.) For three or four weeks in July, 1997, Molina worked as a shoe store salesperson. (Tr. 32, 61-62.) She ceased working there "due to intense pain" she suffered as a result of lifting shoe boxes, bending, and standing. (Tr. 61, 32.)

III. Plaintiff's Treatment and Medical Evaluation History

Since 2001, Molina has been examined by several physicians and physical therapists. On January 22, 2001, x-rays of Molina's back (ordered by Dr. Elyse Olshen of Columbia Presbyterian Hospital) revealed scoliosis of the midthoracic spine with convexity to the right, but normal bone density in the right shoulder, and no evidence of acute fracture or dislocation. (Tr. 88.)

3

On October 26, 2001, Dr. Christopher Michelson, Chief of Orthopedics, New York Presbyterian Hospital, examined Molina. Dr. Michelson's examination revealed that Molina had normal range of motion and muscle strength. (Tr. 97-103.) Dr. Michelson observed Molina's stiffness while she dressed and undressed, and that Molina walked with a normal gait without any assistive device. (Tr. 101.) Dr. Michelson recorded that Molina's flexion, or ability to bend forward at the waist, was limited to thirty degrees.[2] (Id.) Examination of her cervical spine, or neck, revealed a normal range of motion. (Tr. 97). Her shoulders, hips, and legs showed normal strength and range of motion. The straight leg test revealed pain at 100 degrees,[3] and there was tenderness in the L3-5 regions of the spine. (Tr. 100.) While the record of proceedings includes Dr. Michelson's examination records, it does not include his opinion as to Molina's capacity to perform work-related and other physical activities. Dr. Michelson's provisional diagnosis in the examination records is illegible.[4] (Tr. 102.)

An x-ray ordered by Dr. Michelson on March 12, 2002, revealed scoliosis with straightening of the curve, both small and prominent bulging discs, short pedicles, or growths on the spine, mild stenosis, and narrowed lateral recesses. (Tr. 106.) On April 30, 2002, Dr.

---

[2] The average range of motion for the thoracolumbar spine region, or lower back, is ninety degrees forward flexion, and thirty degrees backward extension. Attorney's Textbook of Medicine §181.20, at 65-66. (3d. ed. 1999).

[3] Straight leg raising is a test used to differentiate among disorders of the sacroiliac, lumbosacral and hip joints and the sciatic nerve. Attorney's Textbook of Medicine § 15.34(1), at 15-22. Flexion of the leg through the range of sixty to ninety degrees is considered normal. Id.

[4] The parties have differing interpretations of Dr. Michelson's handwriting in the provisional diagnosis. Plaintiff reads it as "low back disorder, scoliosis, and impingement." (P. Mem. 6.) Defendant reads it as "rule out low back spondylolysis and significant scoliosis." (D. Mem. 6.)

4

Michelson examined Molina again, and reported a diagnosis of scoliosis and herniated nucleus pulposus. (Tr. 108.) Molina was no longer able to see Dr. Michelson after her husband's health insurance changed to a plan that Dr. Michelson did not accept. (Tr. 16, 35.)[5]

Dr. Michelson referred Molina to Larry Shapiro for physical therapy. From January 4, 2002, through March 18, 2002, Molina attended five sessions of physical therapy. (Tr. 134-135.) In a letter dated March 20, 2002, Mr. Shapiro reported that Molina continued to experience pain in her low back and decreased strength in her right shoulder. (Tr. 109.) He reported that Molina was unable to work and would remain so indefinitely. (Id.)

On April 10, 2002, at the request of the Social Security Administration ("SSA") (Tr. 17), Molina was examined by consultative physician Dr. Kyung Seo of Diagnostic Health Services, Inc.[6] (Tr. 110-111.) Molina had no difficulty getting on and off the examination table. (Tr. 110.) Her cervical spine, or neck, showed that forward flexion was limited to forty degrees, and backward extension was limited to zero degrees,[7] but no muscle spasm was observed. (Id.) The

---

[5] At the hearing, Molina stated both that her husband's insurance changed in mid-2000, and that the change in insurance was the reason she could no longer receive treatment from Dr. Michelson, although she was examined by Dr. Michelson in 2001 and 2002. (Tr. 35.) In his decision, the ALJ stated that the insurance changed in mid-2002. (Tr. 16.) The parties do not address these discrepant chronologies.

[6] See 20 C.F.R. 416.919 ("A consultative examination is a physical or mental examination or test purchased for you at our request and expense from a treating source or another medical source . . . . The decision to purchase a consultative examination will be made on an individual case basis in accordance with the provisions of § 416.919a through § 416.919f.").

[7] The average range of motion for cervical spine flexion and extension, or nodding forward and backward, is ninety degrees total. Attorney's Textbook of Medicine § 181.20, at 62-65. A person with a range of motion of at least forty-five degrees is not considered to have lost range of motion. Id.

range of motion for her shoulders was normal. (Id.) Her thoracolumbar spine, or lower back, showed forward flexion of thirty degrees, and extension of zero degrees.[8] (Id.) The thoracolumbar lateral flexion and rotation was fifteen degrees, with no muscle spasm observed.[9] (Tr. 111.) Molina's range of motion of her legs and hips was normal, but her right thigh showed atrophy of a half inch compared to the left thigh. (Id.) Muscle strength of "both legs [was] Grade 5/5 on the left side and the right side [was] Grade 4/5."[10] (Id.) The straight leg raising test was negative. (Id.) Molina was able to toe walk, heel-to-toe walk, and squat. (Id.) Dr. Seo's "impression" of Molina's condition was degenerative spondylosis, and a post reconstructive scoliosis surgery status.[11] (Id.) He concluded that Molina's ability to sit, stand, and walk was slightly limited, while her ability to bend, lift, and carry heavy objects was severely limited. (Id.)

On April 26, 2002, Dr. Richard Finley of the New York State Department of Family Assistance, Office of Temporary and Disability Insurance, wrote a report after reviewing Molina's medical records, ultimately concluding that the "findings here simply do not permit the

---

[8] The average ranges of motion for thoracolumbar spine flexion and extension, or bending forward and backward at the waist, are ninety and thirty degrees. Attorney's Textbook of Medicine § 181.20, at 65-66.

[9] The average ranges of motion for thoracolumbar lateral flexion (bending to the side at the waist) and rotation (twisting at the waist), are sixty degrees to each side. Attorney's Textbook of Medicine, § 181.20 at 67-70. A person with a lateral flexion range of motion of at least fifty degrees to each side is not considered to have lost range of motion. Id. at 67-68. A person with rotation of at least thirty degrees to each side is not considered to have lost range of motion. Id. at 69-70.

[10] The ALJ understood this to mean that the left leg had a grade of 5/5 and the right leg had a grade of 4/5. (Tr. 17.)

[11] Spondylosis is a general term for degeneration and spinal changes due to osteoarthritis. See Dorland's Illustrated Medical Dictionary ("Dorland's") 1684 (29th Ed.).

6

conclusion that the claimant cannot perform the functions required for work." (Tr. 114.) Dr. Finley opined that Molina could lift and carry twenty pounds occasionally and ten pounds frequently. He also found that Molina could sit and walk for six hours per workday, and "otherwise do light work." (Id.)

On March 12, 2003, Molina began a second course of physical therapy at the New York Presbyterian Hospital, Columbia-Presbyterian Center. (Tr. 128-131.) Molina attended four physical therapy sessions with Hope Manuel. In April 2003, Molina was discharged after missing two sessions.

On August 19, 2003, Molina was examined by Dr. Tarek Mardam-Bey. (Tr. 137.) Dr. Mardam-Bey observed that Molina had "some tenderness in the low back with some decrease in flexion. . . . [and] reduction in her side bending." (Id.) The straight leg raising test was negative to seventy-five degrees and there was no weakness in the legs. Dr. Mardam-Bey referred Molina for additional physical therapy.

On various occasions, Molina has stated that she has taken Motrin (Tr. 83, 86, 95, 108, 110, 133), Ibuprofen (Tr. 86, 142), Tylenol (Tr. 110, 142), and Acetaminophen (Tr. 142) to alleviate her pain. Dr. Seo and Dr. Finley also state that Molina has taken Tylenol #3, a prescription combination of codeine (a narcotic) and acetaminophen (a non-narcotic). See http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202392.html. (Tr. 110, 114.)

IV.     Testimony at the Administrative Hearing

At the September 2, 2003, ALJ hearing, Molina was represented by paralegal Francine Wilson of Harlem Legal Services. Molina testified with the aid of a Spanish interpreter. (Tr. 13.) About mid-way through Molina's testimony at the hearing, the ALJ concluded that Ms.

7

Wilson was not sufficiently prepared to represent Molina, and took over the questioning. (Tr. 33.) The ALJ questioned Molina about her condition and physical abilities; her ability to speak, read, and write English; and the chronology of her treatment. (Tr. 28-42.)

Dr. Richard Wagman testified at the hearing as a medical expert, and the ALJ questioned him. (Tr. 39-40.) Dr. Wagman stated that Molina's was "a story where the symptoms seem vastly out of proportion to the actual findings." (Tr. 39.) He further stated that although Molina suffers from "some degree of scoliosis," she should have a "really low level of pain." (Tr. 40.) Dr. Wagman observed that Molina "got up easily and stood rather well" when she stood up to testify at the hearing, and that none of her examining physicians observed any muscle spasms. (Id.) Further, Dr. Wagman stated that Molina was taking "minimum" medication. (Id.) Dr. Wagman concluded that, although Molina should not carry anything heavy, she could carry twenty pounds occasionally, and could "certainly" carry ten pounds. (Id.) Upon being asked by the ALJ whether Molina could perform "light exertion," Dr. Wagman said she could. (Id.)

Mark Namouth testified as a vocational expert, and the ALJ questioned him. (Tr. 41.) The ALJ asked Namouth to identify work appropriate for a person of Molina's age, education, and work experience, assuming she could perform "sedentary work with a sit/stand option."[12] (Tr. 41.) In response to the ALJ's questions, Namouth identified ticket checker, assembler, and surveillance system monitor as examples of appropriate work for someone who fit the description

---

[12] See 20 C.F.R. § 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

the ALJ provided. (Id.)

V.   ALJ's Decision

In evaluating the evidence, the ALJ concluded that Molina's credibility "was sorely lacking" for three reasons. (Tr. 15.) First, the ALJ felt that he had to "pry out of [Molina] any admission of any facility in English at all." (Tr. 15.) He felt that Molina contradicted herself by stating both that she has no ability to write English, and that she passed high school exams in English. (Tr. 31-32.) Second, the ALJ found that Molina's " 'explanation' for her lack of significant medical treatment [was] not very credible." He thought her medical treatment history suggested she was not looking for treatment for serious pain. (Tr. 18.) Finally, he found that Molina was overstating both the extent of her pain and the extent to which her pain interfered with her functionality. (Id.) He noted "that [Molina] sat without the slightest sign of discomfort for about three times as long as she claimed was her limit, during the hearing." (Tr. 16.) In addition, the ALJ concluded that the activities Molina described engaging in were inconsistent with her description of her pain and her ability to sit, stand, and walk for extended periods of time. (Tr. 17-18.) The ALJ also noted that Molina has "only . . . been prescribed . . . Tylenol, Ibuprofen, and Acetaminophen." (Tr. 16.)

Although the ALJ did not expressly discount the records and opinions of Dr. Michelson, Dr. Seo, and Dr. Mardam-Bey in his reaching his decision, the ALJ expressly agreed with Dr. Wagman's evaluation of the evidence.[13] (Tr. 17.) The ALJ also based his functional capacity finding on Dr. Wagman's evaluation of the evidence. (Tr. 19.) Drawing on Dr. Wagman's

---

[13] The ALJ stated that Shapiro's opinion is "entitled to no special weight under agency rules," since he is a physical therapist rather than a doctor. (Tr. 16-17.)

9

testimony, the ALJ found that Molina has "severe scoliosis" (Tr. 18), but is not disabled because she has "an exertional capacity for light work," and in the alternative a capacity for sedentary work with a sit/stand option.[14]  (Tr. 19, ¶¶ 11 and 12.)  The ALJ noted, however, that a person "with even mild scoliosis" would find it "problematic" to bend.  (Tr. 18.)

## DISCUSSION

I.  The Applicable Law

   A.  Determining Disability

In order for a claimant to be deemed disabled, she must demonstrate her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. 423(d)(1)(A).  Moreover, the impairment must be:

> of such severity that [she] is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for h[er], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).

---

[14] See 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

The Commissioner is required to apply a five-step procedure in evaluating disability claims. 20 C.F.R. § 416.920. As the Second Circuit has explained:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits h[er] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider h[er] disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform h[er] past work. Finally, if the claimant is unable to perform h[er] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)).[15] The disability claimant bears the burden of proving the first four steps. Once the claimant's burden has been satisfied, the burden shifts to the Commissioner to establish the fifth step – that the claimant is able to perform work that exists in the national economy. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

B.  Standard of Judicial Review

It is not the district court's "function to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir.1998) (internal quotation marks and emphasis omitted). A district court may "set aside the ALJ's decision only where it is based

---

[15] Appendix 1, cited by the Second Circuit in Rosa, 168 F.3d at 77, appears in 20 C.F.R. Part 404, Subpart P, and is incorporated by reference into Part 416 in 20 C.F.R. § 416.925.

upon legal error or is not supported by substantial evidence." Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir.1998); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Further, "it is up to the agency, and not [the district court] to weigh the conflicting evidence in the record." Clark v. Comm'r of Social Security, 143 F.3d 115, 118 (2d Cir. 1998).

The Commissioner's findings as to any fact are conclusive if supported by "substantial evidence." 42 U.S.C. § 405(g). In the context of Social Security benefits, "substantial evidence" has been defined as " 'more than a mere scintilla . . . [,] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "The substantial evidence standard applies not only to the Commissioner's findings of fact, but also to her inferences and conclusions." Toribio v. Barnhart, No. 02 Civ. 4929 (GEL), 2003 WL 21415329, at *2 (S.D.N.Y. Jun. 28, 2003). Moreover, such inferences and conclusions must be affirmed even where the reviewing court's own analysis may differ, so long as substantial evidence supports the Commissioner's decision. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (" '[T]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review' ") (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)); see also DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d. Cir. 1998) (affirming Commissioner's decision where there was substantial evidence both for and against the decision).

Despite this apparently deferential standard of review, administrative decisions regarding claimants' eligibility for disability benefits have proven surprisingly vulnerable to judicial

reversal. This vulnerability results primarily from Commissioner's creation – and the courts' subsequent enforcement – of various procedural obligations to which ALJs must scrupulously adhere. Failure to adhere to these obligations is treated as "legal error" permitting reversal of the ALJ's decision. See Toribio, 2003 WL 21415329, at *2.

"In light of these procedural obligations, a district court reviewing a benefits denial may not simply accept the administrative determination based on a cursory review of a record that includes plausible testimony, documentary evidence, or expert opinion that supports the administrative determination. Rather, the district court must carefully evaluate the record to determine whether the ALJ complied with all the relevant regulations." Thomas v. Barnhart, No. 01 Civ. 518 (GEL), 2002 WL 31433606, at *4 (S.D.N.Y. Oct. 30, 2002).

II.     Claims of Procedural Error

   A.     ALJ's Duty to Develop the Record

Molina contends that the ALJ failed to properly develop the administrative record by neglecting to acquire or seek out an opinion from Molina's treating physician, Dr. Michelson, as to her medical condition. (P. Mem. 13.) While the ALJ subpoenaed Molina's medical records from Dr. Michelson via Columbia Presbyterian Medical Center, this subpoena did not include a request for an opinion report from Dr. Michelson, and Dr. Michelson did not provide one in response to the subpoena. The ALJ made no other requests of Dr. Michelson.

The ALJ has "an affirmative obligation to develop the administrative record." Perez, 77 F.3d at 47. In evaluating the record, the ALJ is to give "[s]pecial evidentiary weight to the opinion of the treating physician." Clark, 143 F.3d at 118. In light of the special evidentiary weight given to the opinion of the treating physician, and the ALJ's affirmative obligation to

13

develop the administrative record, the ALJ must "make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of the that treating physician as to the existence, the nature, and the severity of the claimed disability." Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y.1991). While the Regulations state that "the lack of the medical source statement will not make [a medical] report incomplete," 20 C.F.R. § 416.913(b)(6), the Second Circuit requires the ALJ "to seek additional information from [the treating physician] *sua sponte*." Clark, 143 F.3d at 118. Therefore, although there may be cases in which a treating source opinion is unavailable, the ALJ must make a reasonable effort to obtain such an opinion.

The ALJ here did not make a reasonable effort to obtain an opinion report from Dr. Michelson.[16] The ALJ could have easily appended to the subpoena he directed to the hospital a request for an opinion from Dr. Michelson. Or, as ALJs often instruct claimants to do, the ALJ could have provided Molina with a form titled "Medical Assessment of Ability to do Work Related Activities," and instructed her to ask her treating physician to complete the form. See, e.g., Lisa v. Sec'y of Dept of Health and Human Servs., 940 F.2d 40, 46 (2d Cir. 1991); Devora v. Barnhart, 205 F. Supp. 2d 164, 168 (S.D.N.Y. 2002); Santiago v. Apfel, No. 98 Civ. 9042 (HB), 2000 WL 488467, at *6 (S.D.N.Y. Apr. 25, 2000); Duraku v. Apfel, No. 98 Civ. 4788 (JG), 1999 WL 287736, at *3 (E.D.N.Y. May 5, 1999).

In connection with this motion, plaintiff provided to the Court a written opinion by Dr. Michelson, dated February 16, 2005. (P. Reply, Ex. A (Letter from Christopher B. Michelson,

---

[16] Although Dr. Michelson apparently had stopped treating Molina by the time of the hearing in September 2003, he was still treating her at the time of her application. The Commissioner does not argue that Dr. Michelson should not be considered a treating physician.

MD, to Center for Disability Advocacy Rights, dated February 16, 2005 ("Michelson Letter"), at 2).) Defendant argues that it would be improper for the Court to consider Michelson's letter, because the letter constitutes new evidence outside the scope of the administrative record.[17] (Letter from Susan C. Branagan to the Court, dated April 1, 2005, at 2.) To the extent that Molina offers Dr. Michelson's 2005 opinion as substantive evidence to attack the Commissioner's judgment, defendant is correct that it may not be so considered.

A court may remand a case to the Commissioner and order the Commissioner to consider additional evidence "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). This test is satisfied, however, only if the plaintiff shows that (1) "the evidence is new and not merely cumulative;" (2) the evidence is "material [in that it is] both . . . relevant to the claimant's condition during the time period [covered by the decision] . . . . [and there is] a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently;" and (3) there is "good cause for her failure to present the evidence earlier." Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988); Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991).

---

[17] Defendant also argues that the opinion was improperly submitted for the first time with plaintiff's reply brief. (Letter from Susan C. Branagan to the Court, dated April 1, 2005, at 1.) Plaintiff's counsel represents that he "began his efforts to secure [Dr. Michelson's] statement shortly after [his] first meeting with Molina in mid-December 2004" (P. Reply 3), but apparently Dr. Michelson did not author the letter until February 16, 2005, a few days after plaintiff filed her February 11, 2005, brief in support of her cross-motion for judgment on the pleadings. Although it would have been more proper for plaintiff to have submitted the letter at an earlier time, the delay is reasonable in light of the fact that Molina was only able to retain counsel after defendant had already moved for judgment on the pleadings.

Dr. Michelson's letter certainly satisfies the first factor in that it is new. As to the second factor, while the letter is material in that it addresses Molina's functional capacity, it is unclear whether Dr. Michelson's opinion speaks to the claimant's condition during the time period covered by the ALJ's decision. Dr. Michelson states that he has "treated Ms. Molina *since* October 26, 2001" (Michelson Letter at 1 (emphasis added)), suggesting that he continues to treat her, yet the record contains examination reports only from 2001 and 2002. (Tr. 92-108.) Dr. Michelson says he made the diagnosis in his letter "[a]fter [his] evaluation and testing" of Molina, but he does not specify the date of the evaluation or testing to which he refers. (Id. at 1.) Dr. Michelson also lists the "work related functions . . . Ms. Molina *has* the ability to perform," the present tense suggesting that the letter embodies his opinion of Molina's condition as of February 16, 2005, rather than as of the time of her application for benefits. (Id.) As Dr. Michelson's letter is ambiguous as to the time period to which it applies, its materiality as to Molina's condition during the time period covered by the ALJ's decision cannot be determined. Accordingly, since the Michelson letter does not constitute a clear statement of Dr. Michelson's opinion regarding Molina's health functional capacity during the relevant time period, the Court will not order the Commission to consider this additional evidence.[18]

---

[18] As to the third factor, Molina should not be faulted for failing to present an opinion from Dr. Michelson at the hearing. Molina was not represented by counsel at the hearing, and the ALJ failed to make a reasonable effort to acquire Dr. Michelson's opinion, or inform Molina that such evidence was important, as is the custom of ALJs. See Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 756-757 (2d Cir. 1982) (remanding case in which relevant testimony was not presented by claimant represented by social worker, and ALJ did not make efforts to discover testimony); cf. Lisa v. Sec'y of Dept of Health and Human Servs., 940 F.2d 40, 46 (2d Cir. 1991) (finding there was not good cause for claimant's failure to produce functional capacity opinion written by claimant's treating physician when ALJ had stressed at the initial hearing the need for claimant to acquire such a report).

However, Dr. Michelson's belatedly-submitted report is relevant to the Court's decision in this case in another way. Since the ALJ erred in not making a reasonable effort to acquire Dr. Michelson's opinion prior to issuing his decision, the Court must consider whether that error was harmless. That Dr. Michelson recently produced such an opinion demonstrates his willingness to provide a report upon request. Moreover, although, for the reasons stated above, the report is insufficiently clear to require reversal had the report simply been submitted as new evidence, it is sufficiently relevant to suggest that, had the ALJ sought the opinion of Dr. Michelson as treating physician at the time the case was pending before him, material evidence might well have been obtained. Accordingly, the case should be remanded so that a clear and precise opinion from Dr. Michelson on Molina's condition during the relevant time period can be obtained and evaluated by the ALJ.

### B. The ALJ Failed to Address Important Evidence

While it is not necessary that an ALJ "reconcile every conflicting shed of medical testimony," Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), if the ALJ fails to consider evidence in the record, the Court must be "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) (citing Berry, 675 F.2d at 469 (internal quotation marks omitted)).

#### 1. Plaintiff's inability to bend or stoop

Molina argues that her inability to bend or stoop was not sufficiently considered by the ALJ in his finding that Molina is capable of light work. (P. Mem. 17.) Defendant argues that the ALJ's finding "already takes into account the limitations she has in bending and stooping." (D.

17

Reply 6.) Both light and sedentary work require occasional stooping or bending, occasional meaning up to one third of an eight hour day. SSR 83-14 at *4; SSR 96-9p, at *8.[19] "A complete inability to stoop would significantly erode the unskilled sedentary occupation base and a finding that the individual is disabled would usually apply." SSR 96-9p at *8.

The ALJ's finding that Molina is capable of light work is insufficient because he failed to make a finding as to Molina's ability to stoop or bend. Both Dr. Michelson and Dr. Seo observed that Molina's lower back flexion, or ability to bend forward, was limited to thirty degrees. Dr. Seo opined that Molina's ability to bend was "severely limited." As courts have found social security claimants able to bend forward to a greater extent then Molina disabled based on a finding of complete inability to bend, the ALJ should have addressed her ability to stoop and bend in his decision. See Gutierrez v. Barnhart, 109 Fed. Appx. 321, 324-325 (10th Cir. 2004) (remanding for evidence from vocational expert ALJ's decision that plaintiff with scoliosis and flexion limited to seventy degrees was capable of light work); Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003) (remanding case to a new ALJ after finding ALJ's conclusion that claimant could stoop occasionally undermined by limitation of flexion to forty degrees); cf.

---

[19] See SSR 83-14 at *4 ("The major difference between sedentary and light work is that most light jobs – particularly those at the unskilled level of complexity – require a person to be standing or walking most of the workday. Another important difference is that the frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward by bending the spine at the waist."); see also SSR 96-9p at *8 ("An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work. Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.").

Rivera v. Sec'y of Health and Human Servs., No. 92-1988 (HL), 1993 WL 350177, at *2-*3 (D. Puerto Rico, Aug. 26, 1993) (finding that light work is possible with flexion limited to thirty degrees). The ALJ erred in not addressing evidence of Molina's inability to bend or stoop when making his functional capacity determination.

### 2. Plaintiff's medications

The ALJ also overlooked that the record clearly shows that Molina has taken Tylenol #3, a prescription narcotic with codeine, for her pain. (Tr. 110, 114.) In his decision, the ALJ stated that "[t]he only medication [Molina] has been prescribed . . . is Tylenol, Ibuprofen and Acetaminophen." (Tr. 16.) Dr. Wagman, on whose evaluation of the evidence the ALJ relied, stated that Molina is "taking very minimum medication." (Tr. 40.) The ALJ's and Dr. Wagman's oversight likely resulted from the fact that at the hearing Molina gave the ALJ a note listing her medications as Tylenol, Ibuprofen, and Acetaminophen (Tr. 142), and Molina stated that Tylenol was the medication that helped her. (Tr. 36.) It is unsurprising that a lay person would fail to differentiate between ordinary Tylenol, a non-prescription pain medication, and a much stronger narcotic drug with the same brand name. The difference, however, is significant, and to the extent the ALJ rested his discounting of Molina's pain symptoms in part on her reliance only on mild medication, that conclusion was based on a mistake.

The ALJ should have considered the fact that Molina was taking Tylenol #3 for her pain in deciding whether Molina was disabled. Although not the strongest of narcotics, codeine is a controlled substance, and is intended to alleviate pain greater than that alleviated by non-prescription medications. That Molina was taking a prescription drug may have shed different light on Molina's claims of pain. Therefore, the case should be remanded for consideration of

19

the evidence of Molina's inability to bend or stoop, and that she was taking Tylenol #3.[20]

## CONCLUSION

The plaintiff's motion for judgment on the pleadings is granted to the extent that the case is remanded to the Commissioner for further proceedings consistent with this opinion. The defendant's motion for judgment on the pleadings is denied.

SO ORDERED.

Dated: New York, New York
       August 15, 2005

                                                  GERARD E. LYNCH
                                                  United States District Judge

---

[20] Molina requests that the Court remand to a new ALJ, "in light of what appears to be a deeply held but nonetheless unsubstantiated belief that Ms. Molina is 'dishonest' and the obvious negative impact this would have on Ms. Molina's chances at another hearing." (P. Mem. 24.) A court should remand to a new ALJ only in cases in which there is "(1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party." Sutherland v. Barnhart, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004). As the record does not indicate that the ALJ's mistakes are a product of bias or hostility toward Molina, and there is no indication that the ALJ would not be able to properly reconsider the evidence in accordance with this opinion, the application is denied.